UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD L. HOGAN,

    Plaintiff,                                              Case No. 05-72483

v.                                                     Hon. Gerald E. Rosen

GENESEE COUNTY SHERIFF'S DEPUTIES
"JOHN DOE 1," "JOHN DOE 2," and "JOHN
DOE 3," and GENESEE COUNTY,

    Defendants.
_____/

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     October 25, 2006

PRESENT:   Honorable Gerald E. Rosen
                      United States District Judge

**I. INTRODUCTION**

Plaintiff Richard L. Hogan commenced this suit in Genesee County Circuit Court on June 7, 2005, alleging that the Defendants — including Genesee County and three unidentified Genesee County sheriff's deputies — violated his civil rights under the Fourth and Eighth Amendments to the U.S. Constitution and committed a number of state-law torts by allegedly mistreating him while he was an inmate at the Genesee County Jail in February of 2003. Defendants removed the case to this Court on June 22,

2005, citing Plaintiff's assertion of federal constitutional claims under 42 U.S.C. § 1983. See 28 U.S.C. §§ 1331, 1441(a).

By motion filed on March 31, 2006, Defendants now seek summary judgment in their favor on all of the federal and state-law claims advanced in Plaintiff's complaint. In response, Plaintiff acknowledges that some of his claims are subject to dismissal: (i) his federal claim of a Fourth Amendment violation in Count I of his complaint;[1] (ii) his state-law claim of assault and battery in Count IV;[2] and (iii) his state-law claim of gross negligence.[3] Thus, the parties' remaining points of contention concern only two of the issues raised in Defendants' motion: (i) whether the record, viewed in a light most favorable to Plaintiff, establishes an Eighth Amendment violation by the unnamed Defendant sheriff's deputies, through either their denial of medical care to Plaintiff or their use of excessive force; and (ii) whether, in the event that Plaintiff's Eighth Amendment rights were violated, there is a basis for holding the Defendant County liable for this constitutional deprivation.

Having reviewed the parties submissions and the remainder of the record, the

---

[1] As Plaintiff recognizes, his claim that excessive force was employed against him while he was a convicted prisoner is governed by Eighth and not Fourth Amendment standards. See Phelps v. Coy, 286 F.3d 295, 299 (6th Cir. 2002).

[2] Plaintiff concedes that this claim is barred by Michigan's two-year statute of limitations for claims of assault and battery. See Mich. Comp. Laws § 600.5805(2).

[3] As noted by Defendants, Plaintiff has alleged only intentional conduct, which cannot form the basis for a claim of gross negligence under Michigan law. See VanVorous v. Burmeister, 262 Mich. App. 467, 687 N.W.2d 132 143, (2004).

Court finds that the relevant allegations, facts, and legal arguments are thoroughly presented in these materials, so that oral argument would not significantly aid the decisional process. Accordingly, the Court will decide Defendants' motion "on the briefs." See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan. For the reasons set forth below, the Court finds that Defendants are entitled to summary judgment, albeit partly on grounds other than those advanced in their motion.

## II. FACTUAL BACKGROUND

The following account derives principally from Plaintiff's deposition testimony, as supplemented by certain materials attached as exhibits to the parties' briefs. On February 21, 2003, Plaintiff Richard L. Hogan was sentenced by a Genesee County judge to pay a fine of $925 or serve 45 days in jail, apparently as a result of his failure to appear on two several-year-old misdemeanor charges of driving while intoxicated and driver's license alteration. Plaintiff began serving his sentence that same day at the Genesee County Jail. At the time, Plaintiff was 56 years old and he suffered from a number of health conditions for which he took a variety of medications.

At his deposition, Plaintiff identified a single incident occurring about a week after he began serving his sentence as the sole basis for the claims asserted in this case. (See Plaintiff's Response, Ex. 1, Plaintiff's Dep. at 57-58.) On that occasion — which, from the record, appears to have been the night of February 27-28, 2003 — Plaintiff awoke at around 4:00 a.m. suffering from a severe cluster headache and difficulty in breathing. His cell mate assisted him in flagging down a guard, Officer Cammon, who escorted Plaintiff

to a main floor desk and contacted a nurse.

Within about four or five minutes, nurse Brenda Fick responded to Officer Cammon's call for medical assistance. Upon Plaintiff's report that he was suffering from a severe headache and was experiencing difficulty in breathing, the nurse checked his blood pressure and gave him a nitroglycerin pill to place under his tongue. Unfortunately, this did not alleviate Plaintiff's symptoms, which included a severe headache, feelings of panic, dizziness, heart palpitations, and chest pain. The nurse told Plaintiff to try to relax and stated that she would be back, and Plaintiff was left to pace the main desk area, feeling "very, very jittery" and attempting to catch his breath. (Id. at 71-72.)

At this point, two additional guards arrived on the scene, one named Browne and the other unidentified, and told Plaintiff to come with them. They took Plaintiff on an elevator down to the booking area on the jail's lower level, where the nurse's station and some "safety cells" were located. Plaintiff was placed on a bench next to the nurse's station and told to wait for the nurse. Plaintiff recalled that perhaps two or three additional guards were in the vicinity, as well as a sergeant whose name he did not know. Plaintiff testified that he was "too nervous" and "panicky" to remain sitting on the bench, and that he instead kept standing up, sitting down, and telling the guards that he felt sick and could not breathe. (Id. at 79-81.)

At some point, the two officers who had escorted Plaintiff down to the booking area grabbed him by the arms and forced him about 40-50 feet down a hallway to a cell. Plaintiff asked where the guards were taking him and "kept hollering I'm sick, I'm sick, I

4

can't breathe," but the officers responded by twisting his arms behind his back and attempting to force him into the cell. (Id. at 85-87.) Plaintiff continued to insist that he was sick, could not breathe, and needed to see the nurse, and he also "was wiggling" in resistance to the guards' efforts to place him in a cell. (Id. at 87.)

At this point, several other guards ran up and "joined the melee." (Id. at 89.) According to Plaintiff, the guards grabbed and twisted his arms, grabbed his legs, choked him, lifted him up and carried him by the neck, and hit him in the face and side. (Id.) In all, Plaintiff estimated that four or five additional guards joined in the effort to force him into a cell, although he was able to identify only one by name — Officer Snow — and another as a sergeant whose name he did not know. (Id. at 91-93.) During this time, Plaintiff was struck by "[s]everal" guards, although he testified that the unknown sergeant inflicted most of the physical force, punching him in the face and neck and placing his knee in Plaintiff's back. (Id. at 93-96.)

Upon forcing Plaintiff into a cell, the guards initially laid him on his stomach on a bench, and then picked him up and strapped him into a restraint chair in the other corner of the cell. (Id. at 97-100.) Plaintiff passed out at this point, and later awakened alone in the cell to discover that his face and eye were swollen, he could not see out of one eye, and his head was hurting. (Id. at 100-03.) While in this cell, Plaintiff was visited by another nurse who checked his blood pressure and asked whether he felt well enough to return to his cell. Plaintiff testified that "by that time I had overcome the panic attack and I was just sore and hurting and angry," so he was returned to his cell. (Id. at 104-05.) In

5

all, Plaintiff estimated that he had been left in the restraint chair for "[m]aybe a couple hours." (Id. at 105.)

Plaintiff subsequently was seen by the jail physician, Dr. Lloyd. The doctor's notes reflect Plaintiff's report that sheriff's deputies had grabbed him and thrown him against a wall and struck him in the face and eye, leaving him unable to see out of his right eye. (See Plaintiff's Response, Ex. 10.)[4] A few days later, on March 3, 2003, Plaintiff was taken for evaluation at the Michigan Eye Institute. Following his release from jail, Plaintiff underwent two surgeries to his right eye in September of 2004 and January of 2005, during which his natural lens was removed and replaced. At his deposition, he characterized his vision in this eye as "[p]oor." (Plaintiff's Dep. at 108.)

Although this is the sole incident about which Plaintiff testified at his deposition, he asserts in his response to Defendants' motion that he also was subjected to excessive force during the first day of his jail term, February 21, 2003.[5] In support of this additional claim, Plaintiff cites jail records regarding two separate grievances that he evidently filed during his first week at the jail, one concerning an alleged assault that occurred upon his arrival at the booking area on the first day of his term, and the second concerning the alleged assault on the morning of February 28, 2003 that Plaintiff described at his

---

[4]Although Plaintiff states in his response to Defendant's motion that he was seen by Dr. Lloyd "[f]ive days" after the incident, (Plaintiff's Response Br. at 5), the doctor's notes indicate that he examined Plaintiff on the morning of February 28, 2003, shortly after he suffered his injuries, (see Plaintiff's Response, Ex. 10.)

[5]At his deposition, Plaintiff expressly denied that this lawsuit was based on any incident that occurred during his first day at the jail. (See id. at 57.)

deposition. (See Plaintiff's Response, Ex. 8, 3/3/2003 Memo by Corrections Administrator Ken Emigh (describing two separate incidents on February 21 and 28).)

According to Plaintiff's February 27, 2003 grievance concerning the February 21 incident, Plaintiff informed an officer in the booking area "of his physical disability and condition," and then was "assaulted and forced into a holding cell after being beaten and strangled." (Plaintiff's Response, Ex. 5.) Plaintiff further stated that he was hit in the right eye during this assault and "no longer ha[d] sight," and that he had reported this injury to the jail's medical staff but "ha[d] yet to receive treatment from an eye doctor." (Id.)[6] Plaintiff evidently identified Sergeant Coon and Deputies Allen, Lopez, and Stadler as involved in this incident. (See Plaintiff's Response, Ex. 8, Emigh 3/3/2003 Memo.)[7]

The record also includes a report from Sergeant Coon regarding this incident, which states that during the second shift on February 21, Plaintiff was placed in a restraint chair because of his "uncooperative, noncompliant, loud, disruptive, and assaultive"

---

[6] In light of this reference to an eye injury, Plaintiff surmises in his response to Defendants' motion that this February 21 incident was the one he recalled at his deposition. (See Plaintiff's Response Br. at 2 & n.1.) Yet, in this same response, he recounts his deposition testimony as purportedly describing the February 27-28 incident. (See id. at 4-5.) In short, it is not entirely clear what happened (and what injuries Plaintiff suffered) in each of the two incidents identified in his response to Defendants' motion.

[7] As noted, Emigh's memo refers to two separate incidents on February 21 and 28. As to the latter, the memo states that Plaintiff identified Deputies Metropoulos, Clark, and Reynolds as involved in the February 28 assault. (See id.) It does not appear, however, that Plaintiff referred to any of these individuals in his deposition testimony.

behavior.  (See Plaintiff's Response, Ex. 7.)[8]  Finally, Plaintiff indicates that his placement in a restraint chair on February 21 was captured on videotape.

### III.  ANALYSIS

A.     **The Standards Governing Defendants' Motion**

Through the present motion, Defendants seek an award of summary judgment in their favor as to each of the claims advanced in Plaintiff's complaint.[9]  Under the pertinent Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases — Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317 (1986) — ushered in a "new era" in the federal courts' review of motions for summary judgment.  These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.  Celotex explains:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who

---

[8]Emigh also sought statements from Deputies Allen, Lopez, and Stadler regarding their recollections of the February 21 incident.  As observed by Plaintiff, these deputies uniformly acknowledged that Plaintiff had been placed in a restraint chair, but they otherwise were unable to recall anything about the incident in question.  (See Plaintiff's Response, Ex. 9.)

[9]As noted earlier, Plaintiff does not oppose several of the arguments made in Defendants' motion, leaving only Plaintiff's Eighth Amendment claims against Genesee County and three unnamed sheriff's deputies still to be addressed by the Court.

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex, 477 U.S. at 322.

Upon reviewing this trilogy of Supreme Court decisions, the Sixth Circuit adopted a series of principles governing motions for summary judgment:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989); see also Nernberg v. Pearce, 35 F.3d 247, 249 (6th Cir. 1994). The Court will apply these standards in resolving Defendants' motion.

**B.      Following the Close of Discovery, Plaintiff Can No Longer Go Forward on His Eighth Amendment Claims Against the Three "John Doe" Sheriff's Deputies Named in His Complaint.**

9

As somewhat of an aside in the brief in support of their motion, Defendants observe that Plaintiff has yet to substitute named parties for the three "John Doe" Genesee County sheriff's deputies named as defendants in his complaint.  (Defendant's Motion, Br. in Support at 9 n.7.)  Plaintiff's response, also relegated to a footnote, is that Defendant's "criticism" on this point is "ill-timed, seriously misguided, and patently false," where the record includes Plaintiff's own statements to jail officials at the time of the February 21 and 28, 2003 incidents identifying the sheriff's deputies who purportedly were involved in these two alleged assaults, and where Defendants also have been in possession of a videotape that discloses at least some of the deputies who were involved in the February 21 incident.  (Plaintiff's Response Br. at 18-19 n.3.)  Yet, neither side addresses the potential legal significance of Plaintiff's failure to substitute named defendants for the "John Doe" sheriff's deputies.  As discussed below, the Court finds that this lack of substitution is fatal to Plaintiff's effort to impose liability upon any individual sheriff's deputies in this case.

"John Doe" defendants such as those named in Plaintiff's complaint here are "routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed."  Scheetz v. Morning Call, Inc., 130 F.R.D. 34, 37 (E.D. Pa. 1990).  Thus, the courts have allowed § 1983 suits to go forward against unnamed "John Doe" defendants, in order to allow the plaintiff a reasonable opportunity to identify the officers involved in the alleged constitutional violation.  See, e.g., Yates v. Young, 772 F.2d 909, 1985 WL 13614, at *1 (6th Cir. Aug. 28, 1985); Valentin v. Dinkins, 121 F.3d

2:05-cv-72483-GER-RSW   Doc # 28   Filed 10/25/06   Pg 11 of 19   Pg ID 375

72, 75 (2d Cir. 1997); Billman v. Indiana Department of Corrections, 56 F.3d 785, 789 (7th Cir. 1995); Munz v. Parr, 758 F.2d 1254, 1257 (8th Cir. 1985); Gillespie v. Civiletti, 629 F.2d 637, 642 (9th Cir. 1980).

This latitude has its bounds, however. In particular, "[f]ictitious parties must eventually be dismissed, if discovery yields no identities." Scheetz, 130 F.R.D. at 37; see also Billman, 56 F.3d at 789 ("Of course, eventually the plaintiff must discover the names of the defendants in order to serve summonses on them and thus establish the court's personal jurisdiction, without which the suit must be dismissed."); Aviles v. Village of Bedford Park, 160 F.R.D. 565, 567 (N.D. Ill. 1995) (rejecting the plaintiff's apparent belief in that case that he "ha[d] an unlimited amount of time" to identify and serve the "John Doe" defendants named in his complaint); Saffron v. Wilson, 70 F.R.D. 51, 56 (D.D.C. 1975) (allowing discovery to identify the "John Doe" defendants named in the plaintiff's complaint, but recognizing that "[e]ventually the 'John Doe' defendants must be dismissed from the action"). Having been permitted to commence a lawsuit against "John Doe" defendants, Plaintiff bore "the responsibility of taking the steps necessary to identify the officer[s] responsible for his injuries, a responsibility substantially supported by the discovery mechanisms available to him during the pendency of the lawsuit." Strauss v. City of Chicago, 760 F.2d 765, 770 n.6 (7th Cir. 1985). If a full course of discovery does not result in the substitution of named parties for "John Doe" defendants, the courts have routinely found it proper to dismiss the "John Doe" claims at that point. See, e.g., Strauss, 760 F.2d at 770 & n.6; Cain v. Rock, 67 F. Supp.2d 544, 554 (D. Md.

11

1999); Haussman v. Fergus, 894 F. Supp. 142, 150 (S.D.N.Y. 1995).

Such is the case here. Throughout a full round of discovery and a full round of briefing on Defendants' summary judgment motion, Plaintiff has never sought to amend his complaint to substitute named parties for the "John Doe" sheriff's deputies. Absent some excuse for this inaction — and, as discussed below, no such excuse has been forthcoming — the window of opportunity for making such a substitution has now closed. "A district court otherwise prepared to act on dispositive motions is not obligated to wait indefinitely for the plaintiff to take steps to identify and serve unknown defendants." Figueroa v. Rivera, 147 F.3d 77, 83 (1st Cir. 1998) (internal quotation marks, citation, and alterations omitted).

Plaintiff's response on this point provides no justification for a further opportunity to substitute named parties for the "John Doe" defendants — to the contrary, it demonstrates that no additional opportunity is warranted. In protesting any suggestion that Defendants might remain ignorant of the true identities of the sheriff's deputies involved in the incidents at issue here, Plaintiff cites materials ***disclosed during discovery*** that name the deputies Plaintiff himself identified at the time as participants in these incidents. (See Plaintiff's Response Br. at 18-19 n.3.) Plainly, then, even if Plaintiff could not recall his own contemporaneous statements and beliefs about who was involved, he surely was reminded of this information during the course of discovery. Moreover, the discovery process uncovered jail records that seemingly shed additional light upon the identification issue, as well as a videotape recording of one of the incidents

12

at issue.[10]  Surely, then, if Plaintiff chides Defendants for seeming to claim ignorance of the sheriff's deputies involved in the incidents at issue in this case,[11] Plaintiff can hardly claim such ignorance himself upon having an opportunity in discovery to review the very same materials that were available to Defendants.

Despite this knowledge — or, at a minimum, ample opportunity to learn the true identities of the "John Doe" defendants — Plaintiff has not sought to amend his complaint to substitute named parties for these defendants.  Indeed, Plaintiff expressly states in his response to Defendants' motion that he plans to seek leave to amend "in an effort to confirm Plaintiff's complaint to information obtained through discovery." (Plaintiff's Response Br. at 2 n.1.)[12]  Yet, Plaintiff has neither made such a request nor

---

[10]To be sure, Plaintiff complains that at least certain of these records, as well as the videotape, were not produced until after he was deposed on November 2, 2005.  Yet, Plaintiff acknowledges that he received some of these materials in late November of 2005, and the remainder by January 26, 2006.  (See Plaintiff's Response Br. at 2 n.1, 18-19 n.3.)  The discovery period remained open in this case until February 28, 2006 — indeed, it was extended by sixty days at the joint request of the parties.  Thus, while the sequencing of discovery might have some bearing upon the evident discrepancies between Plaintiff's deposition testimony and the account he now offers in response to Defendants' motion, it cannot be said that this had any detrimental effect upon Plaintiff's ability to identify the "John Doe" defendants by the conclusion of the discovery period.

[11]For what it is worth, the Court does not read the footnote in Defendants' initial brief as indicating, one way or the other, whether they were aware of the true identities of the "John Doe" defendants.  Rather, Defendants appeared to be making the fairly mundane and wholly valid point that, in the event that Plaintiff were to substitute named parties for the "John Doe" defendants, any individual sheriff's deputies named as parties in such an amended pleading would be entitled to pursue a qualified immunity defense.  To argue, as Plaintiff does in response, that these individual, as-yet-unnamed defendants might somehow have "waived" the defense of qualified immunity is absurd.

[12]Somewhat puzzlingly, however, it appears that this planned request for leave was motivated primarily by Plaintiff's desire to allege two separate incidents of excessive force on

13

explained why he could not have done so promptly after the close of discovery.[13]  Under these circumstances, the Court finds that the claims against the "John Doe" defendants must be dismissed.[14]

---

February 21 and February 27-28, 2003, rather than by an intent to substitute named parties for the "John Doe" defendants.  (See id.)

[13]Notably, even a substitution of parties shortly after the close of discovery might have come too late to avoid a dismissal on statute of limitations grounds.  Plaintiff's § 1983 claims are governed by a three-year statute of limitations.  See McCune v. City of Grand Rapids, 842 F.2d 903, 905 (6th Cir. 1988).  The incidents at issue here occurred in late February of 2003, and the discovery period closed precisely three years later, on February 28, 2006.  Thus, a substitution of parties after the close of discovery could surmount the bar of the statute of limitations only if Plaintiff's amended pleading could be deemed to "relate back" to his initial complaint.  See Fed. R. Civ. P. 15(c).  Yet, under circumstances comparable to those presented here, the Sixth Circuit has held that the substitution of named parties for "John Doe" defendants is "considered a change in parties" that does not "relate back" under the "mistaken identity" rationale of Rule 15(c)(3)(B).  See Cox v. Treadway, 75 F.3d 230, 240 (6th Cir. 1996); see also Force v. City of Memphis, 101 F.3d 702, 1996 WL 665609, at *3-*4 (6th Cir. Nov. 14, 1996).

[14]In light of this ruling, the Court need not address Defendants' contention that the record does not establish a violation of Plaintiff's Eighth Amendment rights by any individual sheriff's deputy, whether known or unknown.  Indeed, as the Seventh Circuit has observed, the subjective state-of-mind component of an Eighth Amendment claim cannot meaningfully be addressed unless the plaintiff identifies "a human being or 'mind' which [the court] may examine to determine whether specific officers acted with a knowing willingness that a constitutional violation would occur."  Harper v. Albert, 400 F.3d 1052, 1065 (7th Cir. 2005) (internal quotation marks, citation, and alteration omitted).  "In order for courts to satisfy the mandate to inquire into the state of mind of prison officials who have allegedly caused a constitutional violation, it is most imperative that we are provided with identified culprits; for without minds to examine, we cannot conduct an individualized inquiry."  Harper, 400 F.3d at 1065 (internal quotation marks, citations, and alteration omitted).

This case amply illustrates this concern.  At his deposition, Plaintiff testified that an unidentified sergeant punched him in the face and eye, even though he was putting up little or no struggle and was merely insisting upon his need for medical attention.  Nonetheless, Defendants argue that the sheriff's deputies involved in this incident appropriately adhered to a "continuum of force" procedure, in response to Plaintiff's continued resistance to their efforts to subdue him.  (See Defendants' Motion, Br. in Support at 9.)  The Court cannot see how it could meaningfully evaluate this claim without *any* testimony or other evidence reflecting the sheriff's deputies' perceptions or beliefs during their altercation with Plaintiff.  This, in the Court's view, provides

**C.     Plaintiff Has Failed to Identify a Viable Basis for the Defendant County's Liability under 42 U.S.C. § 1983.**

In light of this disposition of Plaintiff's claims against the "John Doe" defendants, only a single claim remains at issue in this case — namely, Plaintiff's effort to hold Defendant Genesee County liable for the alleged Eighth Amendment violations committed against him while he was housed at the county jail. In their present motion, Defendants contend that Plaintiff's allegations and evidence are insufficient to sustain such a claim against the County. The Court agrees.

Under familiar principles, "a municipality, or as in this case a county, cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents." Gregory v. Shelby County, 220 F.3d 433, 441 (6th Cir. 2000) (citing Monell v. Department of Social Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978)). Instead, "[f]or liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort." Gregory, 220 F.3d at 441. Moreover, Plaintiff must establish that "through its deliberate conduct, the municipality was the 'moving force' behind" the violation of his constitutional rights — that is, he "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Gregory, 220 F.3d at 442 (quoting Board of County Comm'rs of Bryan County v. Brown,

---

an additional justification for dismissing Plaintiff's claims against the "John Doe" defendants for lack of proper substitution of named parties, rather than embarking upon a conjectural assessment of the conduct of unidentified sheriff's deputies as the parties invite the Court to do.

520 U.S. 397, 405, 117 S. Ct. 1382, 1389 (1997)).

In this case, Plaintiff seeks to forge the requisite causal link between municipal action and the alleged deprivation of his constitutional rights by citing Genesee County's purported failure to properly train its deputies how to distinguish between inmates with serious and less serious medical needs, or between inmates with real and feigned medical needs.  The Supreme Court has recognized that this "failure to train" theory, if proven, provides a basis for municipal liability under § 1983.  See City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204 (1989).  The Court further emphasized, however, that this theory can succeed "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." City of Canton, 489 U.S. at 389, 109 S. Ct. at 1205.  This standard, in turn, can be met by showing that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  489 U.S. at 390, 109 S. Ct. at 1205. Finally, the Court stated that "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." 489 U.S. at 391, 109 S. Ct. at 1206.

In this case, Plaintiff has not produced any evidence linking a posited deficiency in the training of the County's deputies to his claimed injuries.  Simply stated, there is absolutely no indication in the record that Plaintiff was treated any differently, whether

more roughly or otherwise, as a result of a deputy's untrained determination that his medical needs were not serious or were feigned. To the contrary, upon Plaintiff's initial complaints of a severe headache and difficulty in breathing, a guard removed him from his cell and secured the prompt medical assistance of a jail nurse, Brenda Fick. When the nurse's initial attempts at treatment were unsuccessful, Plaintiff was led to a bench adjacent to the jail's nursing station and told to wait for further medical assistance. Nothing in this course of events suggests that any judgment was made as to the legitimacy of Plaintiff's complaints about his health, much less that such a judgment affected the treatment he was given.

To be sure, while Plaintiff awaited further medical assistance, he allegedly was forced into a cell, assaulted, and placed into a restraint chair. Yet, under the record before this Court, it would be a matter of pure conjecture to say that this alleged mistreatment was attributable to a deputy's untrained judgment that Plaintiff was "faking" or otherwise did not have a serious medical need. It is just as possible that the sheriff's deputies in the vicinity fully appreciated Plaintiff's need for additional medical treatment, but nonetheless believed that he was being unduly disruptive as he awaited this treatment. Alternatively, one or more of these deputies could have grossly overreacted to Plaintiff's continuing complaints of illness, pain, and difficulty in breathing, and decided to forcibly place him in a restraining chair simply to put an end to these complaints. Under either of the latter two scenarios, any additional training in detecting genuinely serious health needs would not have led to a different outcome, as the deputies' conduct would not have

17

been influenced by their judgments as to the extent or severity of Plaintiff's medical condition.

Whether the deputies believed or did not believe that Plaintiff truly was suffering from a severe headache, a panic attack, shortness of breath, or any other legitimate medical condition, Plaintiff presumably would view the deputies' alleged treatment of him as equally improper. Taking Plaintiff's version of events as true, one or more sheriff's deputies used excessive force against an inmate who was not causing any problems, but merely was seeking medical attention. Yet, Plaintiff has failed to identify any connection between this alleged mistreatment and a purported deficiency in the deputies' training. Rather, he seemingly invites the Court to infer from this single episode that the deputies must have been improperly trained, and that the Defendant County was deliberately indifferent to the need for better training. The case law precludes such inferences, however. See Thomas v. City of Chattanooga, 398 F.3d 426, 432-33 (6th Cir. 2005) (rejecting an "attempt[] to infer a municipal-wide policy based solely on one instance of potential misconduct"). Accordingly, the Court finds that Defendant Genesee County is entitled to summary judgment in its favor on Plaintiff's claim of an Eighth Amendment violation.

## IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' March 31, 2006 motion for summary judgment is GRANTED.

                                      s/Gerald E. Rosen
                                      Gerald E. Rosen
                                      United States District Judge

Dated: October 25, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 25, 2006, by electronic and/or ordinary mail.

                                      s/LaShawn R. Saulsberry
                                      Case Manager